IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| J.V. b/n/f/ JOSE VEGA AND MARGARITA VEGA, Plaintiffs | § § § § | |
| v. | § § | Civil Action No. 1:21-cv-115 |
| BROWNSVILLE INDEPENDENT SCHOOL DISTRICT Defendant | § § § § | |

## ORIGINAL COMPLAINT

**NOW COMES** J.V. (the Student") by and through his next friends and natural parents, Jose Vega and Margarita Vega, (collectively termed "the Plaintiffs" herein) and files this their *First Original Complaint* alleging that the Brownsville Independent School District (hereinafter referred to the "School District"), violated the various rights of J.V., as more specifically pled herein. Plaintiffs reserve the right to replead if new claims and issues arise upon further development of the facts, as permitted by law. In support thereof, Plaintiffs would respectfully show this tribunal the following:

### I. BRIEF INTRODUCTION TO THE CASE

1. J.V. was born on February 12, 2004. He has been diagnosed with cerebral palsy, cognitive deficiencies and is wheelchair bound. Even now, at seventeen (17) years old, he still requires substantial assistance for all his daily living requirements, including and especially when toileting. It is uncontroverted that he is a person with a disability. At all times relevant to this case, he attended the Brownsville Independent School District and received significant accommodations and modifications so that he could receive equal access and

        benefit to his academic and non-academic environment to the same extent as his non-disabled peers.

2.      On or about March 29, 2016, J.V. attended a field trip sponsored by the School District but did not receive any of the normal toileting accommodations and modifications he otherwise required, so as to be safe. Not surprisingly, when he was taken to the bathroom at a local restaurant by an Aide he was injured and experienced a fractured femur for which he underwent surgery the next day.  Unfortunately, J.V. continues to experience significant physical damages to this day because of the District's failure to provide him those necessary accommodations and modifications.  Accordingly, he brings forth this lawsuit alleging he was a victim of discrimination based upon disability pursuant to the Americans With Disabilities Act 42 U.S.C. §12131 *et seq.* ("the ADA"), Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794 and the Texas Human Resources Code.

## II. JURISDICTION

3.      J.V. is a citizen of the State of Texas and was at all pertinent times a student in the Brownsville Independent School District.

4.      Jurisdiction is conferred upon this Court pursuant to 28 U.S.C.A. §§ 1331 and 1343 because the matters in controversy arise under laws of the United States including but not limited to the Rehabilitation Act and the Americans With Disabilities Act, and the federal regulations issued thereunder.

5.      Furthermore, this Court has supplemental jurisdiction over various state and common law claims pursuant to 28 U.S.C. §1367.

## III. VENUE

6. Under 28 U.S.C. § 1391, venue is proper before this Court because the events and omissions giving rise to the Plaintiffs' claims occurred in the Southern District of Texas, Brownsville Division.

## IV. PARTIES

7. J.V. lives with his father and mother, Jose and Margarita Vega at 7130 Chicago Avenue, Brownsville, Texas 78521. They live within the Brownsville Independent School District catchment area.

8. The Brownsville Independent School District is a school district organized under the laws of the State of Texas. At all times pertinent to this case, J.V. was a student at the Brownsville Independent School District. They may be served through their current Superintendent, Dr. Ray Gutierrez at 1900 E. Price Road, Brownsville, Texas 78521.

## V. STATEMENT OF FACTS

A. ABOUT J.V.

9. J.V. was born on February 12, 2004. He lives with his parents, Juan and Margarita Vega.

10. J.V. has been diagnosed with cerebral palsy due to curvature of his spine.

11. He has an orthopedic impairment, a speech impairment and a low IQ, also known as an Intellectual Disability.

12. One of his legs is shorter than the other. His legs are very stiff. J.V. would often complain about pain in his leg. He also has a left hip that was well-known to dislocate often.

13. He can make sounds that are audible but he is hard to understand. His way of talking and moving his mouth is like "slow motion."

14. J.V. also has limited motor skills.

15. J.V. has a propensity for toileting accidents at home and in the community.

16. Accordingly he needs personal care services at home for toileting purposes. Specifically, he needs someone to take his clothing off and put it back on and help clean him up after using the bathroom.

17. Another accommodation at home was for J.V. was to be placed on an adaptive toilet chair which was placed on top of the toilet.

18. Without this specialized chair he could easily slip off the toilet and be injured.

19. At home and when out in the community he would also wear "adult pull ups" to help stay clean.

20. When J.V. is at home or in the community and his leg would hurt he would communicate by tapping his leg. He would softly say "mi pierna me duele."

21. Prior to the incident made the basis of this cause he was able to ambulate on his own at home.

22. Even when in a wheelchair he also was able to transport himself, though he was very slow and would tire quickly.

23. As to all the above he is considered a person with a disability as contemplated by the ADA and Rehabilitation Act.

B.   J.V. RECEIVED ACCOMMODATIONS AND MODIFICATION AT SCHOOL SO THAT HE COULD RECEIVE EQUAL ACCESS TO PUBLIC EDUCATION SERVICES

24. During a significant period that makes the basis of this complaint he was a student at Lucio Middle School in Brownsville Independent School District.

25. At that time of the incident made the basis of this complaint he was twelve (12) years old and weighed about 60 pounds.

26. Because of his cognitive and physical disabilities noted above, especially as to toleting, J.V. was placed in a classroom that had its own bathroom unlike his non-disabled peers who all shared the bathrooms throughout the school hallways.

27. J.V. also spends a significant time each day in a wheelchair. During this period he would get very stiff.

28. So in response to this disabling condition one accommodation provided by the School District was a special table that would be used to stretch his legs. It was done at least daily.

29. In fact, this accommodation was ordered by his physician.

30. Because of the fragility of his body two people were required to put J.V. on the stretching table.

31. Many of the accommodations and modifications J.V. received at home and in the community regarding toileting also transferred over to the school as well.

32. For instance he required not just some assistance, but skilled assistance from staff to make sure he would not get hurt.

33. Another important accommodation was that when he went to the bathroom two staff were required to take him out of the wheelchair.

34. As noted above, it was and continues to be an important accommodation to his disabilities that he be stretched before being moved or transported.

35. Of course, it was important staff be trained so he would not be stretched too much during the process.

36. Additionally, and just like at home J.V. was provided an adaptive toilet seat which is placed on top of the toilet. Additionally, the seat he had required extra padding to further address his individualized needs.

37. As noted above, J.V. could not sit or use the toilet on his own but requires help getting on and off the toilet seat.

38. Another important accommodation at school was that the Life Skills Classroom where he spent his day had its own bathroom. Additionally, it had a specially padded changing table.

39. Regarding all the above, J.V. needed someone to take his clothing off and put it back on and help clean him up after using the bathroom.

40. The District's then Special Education Director, Ms. Lippa has previously testified that it took special skill to take a child like J.V. from a wheelchair to use the toilet.

41. She has also testified that the School District never developed a training module developed to help staff learn how to correctly take a student like J.V. from a wheelchair to the toilet especially when away from the school house.

42. Further, J.V. Aide, Enrique Rodriguez has testified that no one from the School District ever trained him on how to provide toileting services to a student like J.V. based upon his disabilities, needs and accommodations as noted above.

43. In fact, during the entire time period Mr. Rodriguez worked with J.V. he testified he never used the specially adapted toilet seat with him.

44. Moreover, the staff must have an accommodation plan in place to address J.V.'s toileting needs when away from the campus.

45. For instance, the Special Education Director has testified that to go on an outing with J.V. there must be enough staff to assure there are two staff to take him into the bathroom.

46. Additionally, there must be an accommodation plan in place with a checklist to assure the adaptive toilet chair is brought on the excursion as well as the cushion.

47. Moreover, a changing table at a restaurant should only be used if it accounts for the child's

size and weight. If one is not available, staff must be trained to provide a safe and reasonable accommodation.

C.      ABOUT J.V.'S AIDE, ENRIQUE RODRIGUEZ

48. Rodriguez started with the District in 2007 as a Teacher's Aide. He starting working as a Security Officer for the Police and Security Department for the District in 2009 until 2012. In 2013 he changed from security and started working in the Life Skills Program at the Lucio Middle School. He was evaluated at the end of the school year. In fourteen (14) areas reviewed he received an eight (8) or below expectations in five (5) of them. In these areas of deficiency it was noted he was overly aggressive with the disabled students in particular which created a hostile environment for these students. It was noted he evidenced a lack of professional behavior.

49. In 2014 he was working in the Life Skills Program at the Lucio Middle School and was evaluated at the end of the school year. In twenty one (21) areas reviewed he received a two (2) or below expectations in nine (9) of them. In these areas of deficiency it was noted he did not fully participate in classroom activities and was re-directed in several situations because he was disrespectful to his co-workers.

50. In 2015 he was again working in the Life Skills Program and was evaluated at the end of the school year. In twenty one (21) areas reviewed he received a two (2) or below expectations in five (5) of them. In these areas of deficiency, it was noted he had a tendency to overreact, needed improvement in working in a professional manner and his mannerisms were not acceptable. There was no evaluation completed for 2016.

51. There is nothing in Rodriguez' employment file that he received any training on how to provide toileting services to a student like J.V. He has admitted the District's failure in this

regard.

52. At the time Rodriguez worked with J.V. in 2016 he weighed at least 315 pounds.

D. J.V. DID NOT RECEIVE REQUIRED ACCOMMODATION AND MODIFICATIONS SO HE COULD BE TOILETED SAFELY WHILE ON A SCHOOL OUTING

53. On March 29, 2016 he was taken with his classmates to an outing at the Porter Zoo in Brownsville.

54. While at the zoo J.V. complained about pain in his leg to Mr. Rodriguez.

55. He also complained to other staff about the pain in his leg though overall he seemed to be enjoying himself.

56. There was a large bathroom at the zoo but staff decided not to use it before leaving.

57. Afterwards all the students went to Golden Coral to eat.

58. J.V. was wet so he was taken to the restaurant bathroom by his Aide, Enrique Rodriguez. There was no one else available to help take J.V. in and out of his wheelchair safely.

59. The District had also failed to pack J.V.'s adaptive toilet seat or take any extra padding, if he needed to be changed on the floor or elsewhere.

60. The restaurant had a changing table hung from the wall but that was for infants and not for a twelve year old like J.V..

61. Rodriguez has testified he started to put J.V. on the restaurant changing table by himself.

62. The bathroom at the restaurant was small with a bar around the toilet leaving little room for a man of Rodriguez' girth to maneuver.

63. At some point Rodriguez decided he needed additional help and called out from the bathroom. Ms. Castillo, another Teacher's Aide heard the request and went into the bathroom to help.

64. Castillo has reported that when she walked in she saw J.V. on the changing table. She also heard J.V. complain about his leg being in pain at the same time Rodriguez was touching him. She also reports that she heard J.V, say that his leg was in pain when Rodriguez was pulling up his diapers. Castillo has also reported that she observed that J.V.'s legs were stiff when Rodriguez was with working on J.V.

65. Upon reason and belief Plaintiffs do not believe J.V. was stretched before Rodriguez attempted to change J.V.

66. Upon reason and belief Plaintiffs do believe that Rodriguez attempted to stretch J.V. beyond what was safe for him, injuring him in the process.

67. Rodriguez again picked J.V. up by himself, now from the table and placed J.V. back in the wheelchair, also by himself.

68. Before leaving Golden Coral Rodriguez again told Rojas that J.V. had stated he was in pain. Mrs. Rojas decided to wait until they returned to the school to deal with J.V.'s pain.

69. Mrs. Rojas sent to the nurse's office on their return where he visited with the School Nurse, Mr. Joe D. Losoya, RN.  He has written that J.V.'s left knee was swollen.  The nurse called Mrs. Rojas and told her that J.V. was crying and complaining a lot.

70. The nurse believed J.V. needed to see a doctor for an MRI.

71. After finishing with the nurse, J.V. was put on the bus going home again by Mr. Rodriguez.

72. That afternoon J.V.'s mother received a call from another school nurse, Ms. Lulu Longoria, who reported that J.V.'s knee was swollen. Also, because of his pain she did not want to move him.

73. Mother reports that when J.V. came home from school that day he quieter than his usual

jovial self and said he was in pain. He pointed to his leg and said "mi pierna." When she picked him up out of the wheelchair to change him he cried. When she carried him to the bed she cried even more. She noticed his knee was very swollen and there was a dip in his leg above the knee. She believed his leg was broken.

74. Mrs. Vega called Mrs. Rojas who told her J.V. had complained about leg pain so she referred her to the school nurse, who told mother his impression. J.V.'s parents called an ambulance. When they showed up he was crying. Right away the paramedics said his leg was broken.

E.   J.V. REQUIRED SIGNIFICANT MEDICAL CARE

75. J.V. was first taken to the Valley Regional Hospital. While there it was determined he was 4'9" tall and weighed 27.27 kilograms (or 60.12 pounds). The medical record reflects that J.V. had an "Acute distal femoral metaphysis fracture with 50 degree dorsal angulation. Further, the femoral condyles were somewhat rotated and were perpendicular to the tibia plateau. It was observed that any movement exacerbated the pain. He had surgery the next day.

76. The initial diagnosis opined the injury extended to the growth plate. There was also a differential diagnosis that J.V.'s knee was dislocated. He was provided morphine for the pain.

77. He was transferred to another hospital because he required a higher standard of care. Now at the Rio Grande Hospital he had surgery the next day.

78. J.V. was put in cast and missed school for about two and a half months. During this period he missed out on his regularly scheduled Occupational Therapy, Physical Therapy, as well as Speech Therapy and Adaptive Physical Education.

79. J.V. now has pins in his leg because of this injury. Before the surgery J.V. was able to ambulate with a walker independently. Since the accident he can lo longer tolerate standing.

80. Since the surgery J.V. is no longer able to ambulate independently with a walker.

81. Now J.V. is only able to move through the environment by wheelchair.

82. J.V. has stated that he was hurt when he was laid down by Rodriguez.

83. J.V has stated he was hurt by Mr. Rodriguez.

84. J.V. stated Rodriguez used one hand to hurt him.

85. That Rodriguez' hand was open.

86. When questioned Rodriguez has stated that J.V. is lying about being injured by him.

87. One teacher, Ms. Castillo states that J.V. is capable of telling someone if he is pain.

88. Ms. Castillo also states that J.V. is capable of telling someone if he was hurt by another person.

89. Ms. Castillo does not believe J.V. is capable of lying.

## VI. STATE ACTION

90. Plaintiffs incorporate by reference all the above-related paragraphs, as well as those below, with the same force and effect as if herein set forth. Moreover, each paragraph below incorporates by reference, as if fully set forth herein, the one above it.

91. The School District Defendant and all their employees including and especially Rodriguez, whether in an Official or Individual Capacity or both, in all matters, were acting under color of state law when they subjected J.V. to the acts and omissions, wrongs and injuries, as set forth herein.

## VII. CLAIMS PURSUANT TO THE AMERICANS WITH DISABILITIES ACT

92. The facts as previously described demonstrate that the School District violated J.V.'s rights as contemplated by the *Americans with Disabilities Act*, 42 U.S.C. §12131, et seq ("ADA").

93. J.V. is a "qualified individual with a disability" as defined in 42 U.S.C. §12131(2) having multiple physical disabilities that affects a major life function, including walking, transporting himself and taking care of his daily needs.

94. J.V. is also deemed "qualified individual with a disability" as defined in 42 U.S.C. §12131(2) having cognitive disabilities that affects a major life function, including learning and communicating. cialization with others.

95. The Brownsville Independent School District is a "public entity" as defined in 42 U.S.C. §12131(1), and receives federal financial assistance so as to be covered by the mandate of the ADA.

96. The Brownsville Independent School District and its schools are facilities and their operation constitutes a program and services for ADA purposes.

97. Specifically, and separate and apart from his Section 504 cause of action below, Plaintiffs allege that the School District failed and refused to reasonably accommodate and modify the services needed by J.V. in violation of Title II of the ADA.

98. Such failures caused injuries to J.V.

### VIII. CLAIMS PURSUANT TO THE REHABILITATION ACT OF 1973

99. The Brownsville ISD receives federal funds and thus follows the requisites of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794.

100. The implementing regulations of Section 504 require that each state that receives disbursements, including the state's political subdivisions such as local school districts,

must ensure all students with disabilities are given appropriate and necessary accommodations, pursuant to federal law and rules. To the degree that a policy or practice hinders honest consideration of a disabled student's unique and individualized needs, and fails to accommodate that child's disability and keep the student safe, it violates Section 504.

A.  FAILURE TO ACCOMMODATE CLAIM

101. Plaintiffs allege that the School District failed to accommodate J.V.'s unique and individualized needs while on the field trip so he could be toileted safely, or providing him necessary modifications to the toileting practices used by Rodriguez while on the field trip, discriminating against J.V. based upon disability thereby. This claim is similar to ADA claim noted above.

B.  FAILURE TO KEEP SAFE CLAIM

102. Plaintiffs additionally assert that because the School District has failed to provide the Student a safe and non-hostile educational environment, such failures as noted above, have together and separately, contributed to violating his rights pursuant to Section 504 and J.V. was thus a victim of discrimination based upon disability by the School District.

IX. **CLAIMS PURSUANT TO THE TEXAS HUMAN RESOURCES CODE**

103. Chapter 121 of the Texas Human Resources Code creates duties for public entity like a Public School District to fulfill, when serving the needs of a student with a disability like T.B. in this cause. Those duties generally include the "duty to make reasonable accommodations in policies, practices and procedures." Texas Human Resources Code §121.003(d)(2).

104. If a School District fails to provide a student with a disability covered by this Chapter

necessary "reasonable accommodations" it creates a private cause of action for that person, pursuant to Texas Human Resources Code §121.004(b) and the aggrieved may seek damages to remedy such injuries.

105. As the Defendant School District failed to provide J.V. reasonable accommodations and he was injured because of such failures, he seeks damages for mental anguish and other damages pursuant to the Texas Human Resources Code.

## X. RATIFICATIONS AND RESPONDENT SUPERIOR

106. Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

107. The Brownsville ISD ratified the acts, omission and customs of school district personnel and staff.

108. As a result, the Brownsville ISD is vicariously responsible for the acts and omissions of staff persons who were otherwise responsible for the safety of J.V.

## XI. PROXIMATE CAUSE

109. Plaintiffs incorporate by reference all the above related paragraphs with the same force and effect as if herein set forth.

110. Each and every, all and singular of the foregoing acts and omissions, on the part of the School District, taken separately and/or collectively constitute a direct and proximate cause of the injuries and damages set forth herein.

## XII. DAMAGES

111. Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

112. As a direct and proximate result of the School District's conduct, J.V. has suffered injuries

and damages, for which he is entitled to recover herein, including but not limited to:

a. Loss of educational opportunities in the past;

b. Loss of educational opportunities in the future;

c. Physical pain in the past;

d. Physical pain in the future;

e. Medical expenses in the past;

f. Medical expenses in the future;

g. Mental anguish in the past;

h. Mental anguish in the future;

i. Physical impairment in the past, and

j. Various out-of-pocket expenses incurred by his family but for the acts and omissions of the School District.

## XIII. DEMAND FOR JURY TRIAL

113. Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a jury trial for all issues in this matter.

## PRAYER

**WHEREFORE, PREMISES CONSIDERED**, Plaintiffs pray for judgment against the School District, in the manner and particulars noted above, and in an amount sufficient to fully compensate them for the elements of damages enumerated above pursuant to Section 504, the ADA, the Texas Human Resources Code and for reasonable attorneys fees, costs of court and the preparation and trial of this cause of action pursuant to 42 U.S.C. §2000d et seq.; as well as for appeal if required, together with pre- and post-judgment interest and for such other relief as this Court deems just and proper whether at law or in equity or both.

Respectfully submitted,

/s/ Martin J. Cirkiel
Mr. Martin J. Cirkiel, Esq.
marty@cirkielaw.com [Email]
SBN 00783829
Federal ID 21488

Cirkiel & Associates, P.C.
1901 E. Palm Valley
Boulevard Round Rock, Texas
78664
(512) 244-6658 [Telephone]
(512) 244-6014 [Facsimile]
**ATTORNEYS FOR PLAINTIFFS**